IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WILLIAM F. CRIST, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civ. No. 09-957-SLR |
| WARDEN PERRY PHELPS, et al., | ) ) ) |
| Defendants. | ) ) |

William F. Crist. James T. Vaughn Correctional Center, Smyrna, Delaware. Pro se Plaintiff.

Joseph Clement Handlon, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants.

**MEMORANDUM OPINION**

Dated: September 15, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff William F. Crist ("plaintiff"), an inmate at the James T. Vaughn Correctional Center ("VCC"), Smyrna, Delaware, filed this lawsuit pursuant to 42 U.S.C. § 1983 on December 14, 2009 alleging violations of his constitutional rights. (D.I. 2) He proceeds pro se and has been granted leave to proceed in forma pauperis. Presently before the court are cross-motions for summary judgment, defendants' motion to strike, and plaintiff's request for counsel. (D.I. 23, 29, 38, 41) The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the following reasons, the court will deny as moot defendants' motion to strike and plaintiff's request for counsel, will deny plaintiff's motion for summary judgment, and will grant defendants' motion for summary judgment.

## II. PROCEDURAL AND FACTUAL BACKGROUND

The first three counts of the complaint allege that defendants Warden Perry Phelps ("Phelps"), Deputy Warden Chris Klein ("Klein"), and Major James Scarborough ("Scarborough") transferred plaintiff to administrative segregation and ignored Department of Correction ("DOC") rules and procedures in retaliation for plaintiff's complaints against the administration. In addition, plaintiff alleges conspiracy to punish him for his letters and complaints.[1] Phelps is the warden at the VCC, Klein is a deputy warden at the VCC, and Scarborough is the security superintendent at the VCC. (D.I. 2, ¶¶ 11-70; D.I. 43, A-32, A-40, A-48)

The court set a February 10, 2011 deadline for filing summary judgment motions, with answering briefs due on or before March 10, 2011, and reply briefs due on or

---

[1]The remaining counts and defendants were dismissed at the time the court conducted its initial screening of the case. (See D.I. 8)

before March 24, 2011. (*See* D.I. 24)  Plaintiff timely filed a motion for summary judgment on January 25, 2011. (D.I. 38)  Defendants did not. Instead, without leave of court and contained within their timely filed opposition to plaintiff's motion for summary judgment, they included a cross-motion for summary judgment. (*See* D.I. 41, 42)  Plaintiff moves to strike defendants' cross-motion for summary judgment and defendants oppose the motion.  As will be discussed, the record supports a finding that summary judgment is appropriate on behalf of defendants.  Under these unique circumstances and, in the interest of judicial economy, the court will not strike defendants' cross-motion for summary judgment and will consider its merits

Plaintiff sent two letters to Commissioner Carl E. Danberg ("Danberg"); one on September 30, 2008 and the other on April 19, 2009.  The September 30, 2008 letter contains a litany of complaints about the VCC, requests a transfer to a different correctional facility, and states in pertinent part:

> It is painfully obvious to me that it is just a matter of time before somebody gets seriously hurt or killed, and most likely going to be staff.  Understand I don't want to be here when that happens, and I damned well don't want to be a part of it.  As mild mannered as I generally am I've found myself contemplating assaulting staff in response to some of their unprofessional acts.  What scares me most is I realized something that staff here has not realized, and that is this:  a person in my situation, a person who knows he is going to die in jail, . . . can if pushed far enough, kill without any repercussion . . . .  I am appealing to you please, please get me out of this institution before this place implodes, or I explode.

(D.I. 43, A-24, A-25)  When plaintiff wrote the September 30, 2008 letter, he was housed at the medium-high housing unit ("MHU") and he remained there following the

2

administration's receipt of the 2008 letter. Phelps believed that plaintiff was adequately secured at the time and did not move plaintiff to a higher security level. (D.I. 43, A-33)

The April 19, 2009 letter complains of inappropriate staff conduct and states in pertinent part:

> I have heard it said, quite frequently of late, that what this jail needs most is a homicide rate. You don't want that, I don't want that, but as things are going I can easily see it coming. Do you really want two or three security staff per year dying in here? If that starts happening you can believe I'll get copies of all my complaints, letters, and grievances into the media's hands.

(D.I. 43, A-28)

Phelps received a copy of the April 19, 2009 letter on May 1, 2009, sent it to Scarborough for follow-up, and shared the letter with Klein. In Scarborough's opinion, the letter contained very threatening language and it greatly concerned him. A few days later, on May 4, 2009, there were two separate incidents wherein DOC staff members were assaulted by inmates in plaintiff's housing unit. According to Phelps and Scarborough, because of the timing of plaintiff's second letter with the staff assaults, they grew even more concerned for the safety of the DOC staff. On May 19, 2009, plaintiff was administratively transferred to isolation in the Security Housing Unit ("SHU") based upon the increasing levels of his threats.[2] Klein had no part in the decision to move plaintiff to SHU. Plaintiff remained in SHU until May 21, 2009, when he was transferred from the isolation unit. According to Phelps and Scarborough, once an

---

[2] "[A]dministrative custody is used to assure a safe and secure environment for all inmates and staff by separating those inmates whose presence in the general population constitutes a threat to themselves, others, or the safety and security of the institution, or who represent an escape risk." *Shoats v. Horn*, 213 F.3d 140, 142 (3d Cir. 2000).

3

inmate is transferred to a maximum security area for administrative reasons, he must work his way back down to a lower security. (D.I. 43, A-33-35, A40-42, A-48)

While housed in SHU, Phelps and Scarborough sought a mental health status report on plaintiff to rule out mental deterioration or decompensation. After receiving mental health status reports on May 27, 2009 and June 11, 2009, and when considering a February 28, 2008 incident wherein plaintiff was found guilty of fighting, disorderly or threatening behavior, and failing to obey an order, Phelps and Scarborough concluded that plaintiff had a behavior problem and that he remained a serious security threat. (D.I. 43, A-34, A-35, A-49)

According to Phelps and Scarborough, plaintiff's transfer to SHU was an administrative decision and not based upon classification. They made the decision to administratively transfer plaintiff to SHU based made upon their perception that plaintiff posed a security threat to the staff and other inmates and in an effort to maintain security and order at VCC. DOC policies and procedures do not require that an inmate be charged with a violation of a code of penal conduct or criminal code in order for the DOC staff to transfer an inmate administratively for security reasons. (D.I. 43, A-35-A36, A-41, A-50)

Classification of inmates is performed by the Multi-Disciplinary Team ("MDT") and the Institutional Based Classification Committee ("IBCC"). Phelps, Klein, and Scarborough did not classify plaintiff or have anything to do with the number of points that were considered as part of plaintiff's classification. Cindy Atallian ("Atallian"), a treatment counselor at the VCC, and Larry Savage ("Savage") were members of the MDT in April 2009 when they assessed plaintiff for his 2009 reclassification. (D.I. 43, A-

4

67, A-70) On April 28, 2009, they recommended plaintiff for medium security level and a transfer to the Sussex Correctional Institution ("SCI"). At the time, Atallian was unaware of the April 19, 2009 letter that plaintiff had sent to Danberg. On June 9, 2009, the IBCC reviewed the April 28, 2009 reclassification paperwork for plaintiff and returned it to Atallian a few weeks later with a note that the reclassification was deferred because plaintiff's current status had changed (i.e., he had been transferred from MHU to SHU on May 19, 2009). Atallian updated plaintiff's paperwork to reflect his transfer to SHU and sent the reclassification paperwork to the MDT members who, at the time, were Savage and counselor Linda Kemp ("Kemp"). Because the MDT had made a change to the April 2009 recommendation, Savage and Kemp conducted a new MDT review. On July 2, 2009, both Savage and Kemp voted that plaintiff be assigned to the maximum security level based upon the number of points (i.e., 17) that he had at the time. (D.I. 43, A-67, A-71) The IBCC approved the maximum security decision on August 13, 2009. (D.I. 43, A35, A-41, A50, A-68, A-70, A-71)

Plaintiff is no longer housed in SHU, having been transferred to MHU on November 5, 2009. According to Phelps and Scarborough, plaintiff transitioned or "flowed down" from SHU to MHU according to normal DOC operating procedures. (D.I. 43, A-36, A-51, A-68)

### III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

5

matter of law."³ Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the clams in question. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–461 (3d Cir. 1989). Pursuant to Rule 56(c)(1), a non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . ." Fed. R. Civ. P. 56(c) (1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007);

---

³Rule 56 was revised by amendment effective December 1, 2010. "The standard for granting summary judgment remains unchanged," and "[t]he amendments will not affect continuing development of the decisional law construing and applying these phrases." Fed. R. Civ. P. 56 advisory committee's note to 2010 Amendments.

*Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–249. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586–587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. at 322.

Plaintiff moves for summary judgment on the grounds that there are no genuine issues of material fact and defendants' challenged actions were the direct result of the letters he wrote to Danberg. Defendants move for summary judgment on the grounds that plaintiff cannot establish a retaliation claim, they were not responsible for plaintiff's annual classification, plaintiff has waived the conspiracy and failure to abide by DOC rules argument, they are immune from suit by reason of qualified immunity, and plaintiff has no entitlement to a MHU housing assignment.

## IV. DISCUSSION

### A. Retaliation

Count one alleges that defendants retaliated against plaintiff for exercising his First Amendment rights when plaintiff was administratively transferred to the SHU isolation unit following letters he wrote to Danberg. Count three alleges that defendants retaliated against plaintiff when they ignored DOC rules and procedures in response to

7

plaintiff's letters and complaints. Defendants move for summary judgment on the grounds that plaintiff cannot establish a retaliation claim.[4]

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under § 1983." *White v. Napoleon,* 897 F.2d 103, 111-12 (3d Cir. 1990). It has long been established that the First Amendment bars retaliation for protected speech. *See Crawford-El v. Britton,* 523 U.S. 574, 592 (1998); *Milhouse v. Carlson,* 652 F.2d 371, 373-74 (3d Cir. 1981). Proof of a retaliation claim requires that plaintiff demonstrate (1) he engaged in protected activity; (2) he was subjected to adverse actions by a state actor; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take adverse action. *Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir. 2001) (quoting *Mt. Healthy Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)); *see also Allah v. Seiverling,* 229 F.3d 220 (3d Cir. 2000) (a fact finder could conclude that retaliatory placement in administrative confinement would "deter a person of ordinary firmness from exercising his First Amendment rights" (citations omitted)). "[O]nce a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision

---

[4]Defendants do not discuss the failure to charge plaintiff with a rules violation as a retaliation claim, but as a separate claim. They argue that plaintiff failed to provide evidence establishing any issue of material fact as to whether defendants ignored DOC rules and procedures in response to plaintiff's letters and complaints. The mere failure of prison officials to follow their own regulations alone is not a constitutional violation. *Davis v. Wilson,* Civ. No. 08-589, 2009 WL 688912, at *8 (W.D. Pa. Mar. 12, 2009); *Estrella v. Hogsten,* Civ. No. 06-1340, 2007 WL 2065879, at *7 (M.D. Pa. July 16, 2007). Regardless, count three raises the alleged failure to follow DOC rules as a retaliation claim and not as an independent claim.

absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Id.* at 334.

The court first considers whether plaintiff engaged in constitutionally protected activity in writing the two letters to Danberg. Under the First and Fourteenth Amendments, prisoners have the right to petition the government for redress of grievances and to freely access the courts. *Milhouse v. Carlson*, 652 F.2d 371, 373-374 (3d Cir. 1981). A prisoner's exercise of his First Amendment freedoms may be curtailed if his speech poses "the likelihood of disruption to prison order or stability, or otherwise interferes with the legitimate penological objectives of the prison environment. *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132 (1977). Notably, a threat is distinguished from constitutionally protected speech. *Watts v. United States*, 394 U.S. 705, 707 (1969).

Not surprisingly, plaintiff and defendants disagree on the threshold issue of whether the First Amendment protects the letters written by plaintiff or whether the letters contained threats unprotected by the First Amendment. Plaintiff argues that his letters contained no criminal threats of any kind and, if they had, he would have been charged, either criminally or with a DOC rules violation. He contends that his letters complained of staff misconduct, growing unrest in the inmate population, and his desire for a transfer to a different institution. In his view, plaintiff made only one threat, "[i]f that starts happening you can believe I'll get copies of all my complaints, letters and grievances into the media's hands." (D.I. 38 at 7) Plaintiff's position, however, is belied by the record. His letters also refer to his contemplation of assault on the staff, a need for a prison homicide rate, and deaths of security staff.

9

Defendants argue that the contents of plaintiff's letters contain threats and, therefore, the letters are not protected under the First Amendment. Regardless, defendants argue that, even if the letters were protected under the First Amendment, the facts demonstrate the decision to move plaintiff to administrative segregation was reasonably related to a legitimate penological interest.

Assuming for purposes of this proceeding that plaintiff has made a showing sufficient to demonstrate that he engaged in constitutionally protected activity, nevertheless, the record does not support a finding that the transfer to administrative segregation was the type of adverse action that would deter a prisoner of ordinary firmness from exercising his constitutional rights. After his transfer from administrative segregation, plaintiff has continued to write to Danberg, sending him letters complaining of conditions at the VCC on March 17, 2010 and July 20, 2010. (See D.I. 46, A35-A40); see Heller v. Keenhold, Civ. No. 04-1893, 2006 WL 759647 (M.D. Pa. Mar. 24, 2006) (the filing of multiple grievances failed to demonstrate that plaintiff's housing deterred him from exercising his constitutional rights).

Moreover, again assuming arguendo that plaintiff's letters constitute protected speech, defendants provided evidence that they would have made the same decision, absent the protected conduct, to transfer plaintiff to administrative segregation for reasons reasonably related to a legitimate penological interest. After reviewing the letters and considering the concurrent prison disturbances, defendants took the action they did in administratively transferring plaintiff for the safety and security of the staff and stability of the institution. In addition, defendants took the added step of consulting with mental health to determine if plaintiff was deteriorating mentally.

Plaintiff takes exception to defendants' position and argues that it is clear that his letters were the reasons for his transfer to administrative segregation. Plaintiff posits that, because defendants concluded his letters were a security threat, they cannot argue that the letters were not the reason for his transfer to administrative segregation, making the administrative transfer retaliatory. He further argues that no action was taken after the first letter and, even after the second letter was written, he was not transferred to administrative segregation until almost three weeks later. He argues, therefore, that the facts do not evidence that defendants perceived him as an immediate threat.

Prison officials require broad discretionary authority as the "operation of a correctional institution is at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974). "When prison officials are confronted with a substantial threat to internal security . . . . the government interest in formulating good faith and reasoned responses to such threats - including the relatively drastic measure of administrative segregation - is compelling. It follows that the level of judicial deference to the prison officials' attempts to deal with such threats should be high." *Mims v. Shapp*, 744 F.2d 946, 953 (3d Cir. 1984). Therefore, prison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices that are needed to preserve internal order and to maintain institutional security. *Bell v. Wolfish*, 441 U.S. 520, 527 (1979).

The facts demonstrate that plaintiff wrote two letters to Danberg and, following Danberg's receipt of the second letter in 2009, plaintiff was administratively transferred to isolation in the SHU. In defendants' views, the threats of the 2009 letter had

11

escalated from the 2008 letter. In addition, within a few days after Phelps received a copy of the 2009 letter, DOC staff members were assaulted in two separate instances in plaintiff's housing unit. Defendants took the step to determine if plaintiff's mental health had deteriorated and, after receipt of mental health reports, they concluded that plaintiff had behavioral issues and that he remained a serious security threat. It is evident that the decision to transfer plaintiff to administrative segregation was based upon a number of factors, with an overriding concern towards the safety and security of the inmates, staff, and the institution.

Finally, there is no evidence of record that defendants retaliated against plaintiff by ignoring DOC rules and regulations. Plaintiff provided no evidence that defendants were required to charge him with a violation before a transfer to administrative segregation. Nor does the record demonstrate that defendants were involved in plaintiff's classification process but, rather, it demonstrates that classification is determined by the MDT and IBCC. Plaintiff concedes that "technically" defendants are not responsible for his annual classification. Nonetheless, he argues that his classification status changed because of defendants' actions. His position is not supported by the record.

Based upon the foregoing, no reasonable jury could find in favor of plaintiff. Defendants provided multiple legitimate, non-retaliatory reasons for plaintiff's transfer to administrative segregation and his maximum security level reclassification. Accordingly, the court will grant defendants' motion for summary judgment as to counts one and three of the complaint and will deny plaintiff's motion for summary judgment as to counts one and three of the complaint.

### B. Conspiracy

Count two alleges that defendants conspired to punish plaintiff for his letters and complaints when, after administratively transferring him, they had plaintiff reclassified to the SHU. In his motion for summary judgment, plaintiff refers to count two, but makes no argument or discusses evidence to support the claim. Defendants move for summary judgment on the basis that plaintiff failed to set forth any evidence or argument to establish an issue of material fact as to whether defendants conspired to violate plaintiff's constitutional rights.

To state a conspiracy claim under § 1983, plaintiff must show that "persons acting under color of state law conspired to deprive him of a federally protected right." *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 254 (3d Cir. 1999). In addition, there must be evidence of actions taken in concert by defendants with the specific intent to violate that right. *Williams v. Fedor*, 69 F. Supp. 2d 649, 665-66 (M.D. Pa.), *aff'd*, 211 F.3d 1263 (3d Cir. 2000) (citing *Kerr v. Lyford*, 171 F.3d 330, 340 (5th Cir. 1999)).

A § 1983 conspiracy claim only arises when there has been an actual deprivation of a right. *Andree v. Ashland Cnty.*, 818 F.2d 1306, 1311 (7th Cir. 1987); *see also Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990) (recognizing that deprivation of a right was a necessary predicate to § 1983 conspiracy liability). *Accord Perano v. Township Of Tilden*, No. 10-2393, 2011 WL 1388381 (3d Cir. Apr. 13, 2011) (slip op.). As discussed above, plaintiff's constitutional rights were not violated. Moreover, there is no evidence of actions taken in concert by defendants with the specific intent to violate plaintiff's constitutional rights. The evidence of record

13

demonstrates that defendants were not involved in plaintiff's reclassification to the maximum security level. For the above reasons, the court will grant defendants' motion for summary judgment as to count two of the complaint and will deny plaintiff's motion for summary judgment as to count two of the complaint.

## V. CONCLUSION

For the above reasons, the court will deny as moot defendants' motion to strike and plaintiff's request for counsel, will deny plaintiff's motion for summary judgment, and will grant defendants' motion for summary judgment.[5]

An appropriate order will issue.

---

[5] The court will not address the issue of qualified immunity inasmuch as there has been no violation of plaintiff's constitutional rights. Further, because the issue is not before it, the court will not address plaintiff's entitlement to housing in MHU. (*See* D.I. 8 at n.2)